RICHARD DOYLE, City Attorney (#88625)
NORA FRIMANN, Assistant City Attorney (#93249)
ALAN R. LIPTON, Senior Deputy City Attorney (#95177)
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California  95113-1905
Telephone Number: (408) 535-1900
Facsimile Number:  (408) 998-3131
E-Mail Address:  cao.main@sanjoseca.gov

Attorneys for CITY OF SAN JOSE, Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| CITY OF SAN JOSE, | Case Number: |
|---|---|
| Plaintiff, | COMPLAINT FOR: |
| v. | (1) BREACH OF CONTRACT |
| JUM GLOBAL, L.L.C., | (2) FRAUD |
| Defendant. | [JURY TRIAL DEMANDED] |

Plaintiff, CITY OF SAN JOSE ("CSJ") states its complaint against JUM GLOBAL, L.L.C. ("JUM") as follows:

**PARTIES**

1.  CSJ is a municipal corporation located in the County of Santa Clara, State of California.

2.  JUM is a Florida limited liability corporation with its principal place of business in Jacksonville, Florida.

**JURISDICTION AND VENUE**

3.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that plaintiff and defendant are citizens of different states and the amount in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

1

COMPLAINT                                                          Case No:

1295194

4. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, a substantial part of the property that is the subject of the action is situated in this judicial district and the parties agreed to exclusive venue in the United States District Court for the Northern District of California.

## STATEMENT OF FACTS

5. On or about August 2, 2011, the California Energy Commission ("CEC") awarded the City of San Jose ("CSJ") Grant Agreement Number ARV-10-016 ("Grant") to conduct a feasibility study of a bio-mass to energy technology in Phase I and to construct and operate a gasification unit utilizing biomass and biosolids feedstocks in Phase II (collectively, "the "Project").  The amount awarded under the Grant Agreement was one million nine hundred thousand dollars ($1,900,000). CSJ and its subcontractors were ultimately obligated to provide approximately four million seven hundred thousand dollars ($4,700,000) in matching funds.  Attached hereto as Exhibit "A" and incorporated herein by this reference is a true and correct copy of the Grant including its exhibits "A" through "F," inclusive.

6. Under the terms of the Grant, the subcontractors approved by the CEC to work on Phase I of the Project were Harvest Power, Inc. d/b/a Harvest Organics, Inc. in California ("Harvest"), Agnion Technologies, GmbH ("Agnion"), URS Corporation ("URS") and HDR Engineering. Among other things, the Grant identified the approved subcontractors, made CSJ responsible for handling all contractual and administrative issues related to the Project, including subcontracts; made time of the essence since the time allotted for completion of the Project was strictly limited; and mandated that the title to equipment obtained with grant funds reside in CSJ. On or about April 14, 2014, Defendant JUM Global, LLC ("JUM") was provided with a copy of the Grant.

7. On or about July 30, 2014 and after completion of Phase I, the Grant was amended ("Grant A1").  Harvest, Agnion and URS withdrew from the Agreement because URS was unable to timely furnish its technology to complete Phase II.  Grant A1 added

JUM Global, LLC ("JUM"), Concord Blue Energy ("CBE") and Zero Waste Energy ("ZWE") to complete Phase II.  Attached hereto as Exhibit "B" and incorporated herein by this reference is a true and correct copy of Grant A1. Generally, JUM's obligations under the Grant and its amendment consisted of constructing, operating, collecting data and deconstructing the demonstration unit.  ZWE's obligations were primarily to provide the feedstock and assistance in site preparation engineering work for the Project.  On or about September 22, 2014, Defendant JUM Global, LLC ("JUM") was provided with a copy of Grant A1.

8.  On or about December 9, 2014 the Grant was amended a second time ("Grant A2") when CBE determined it could not timely furnish its technology and withdrew.  Among other things, the amendment added ICM Technology ("ICM") to build the gasifier.  Attached hereto as Exhibit "C" and incorporated herein by this reference is a true and correct copy of Grant A2.  The existing duties of JUM and ZWE under Grant A1 were not materially changed under Grant A2.

9.  On or about December 17, 2014 JUM entered into an Equipment Sale and Services Agreement with ICM ("ICM Agreement") to purchase the gasification technology to be used on the Project.

10.  On or about January 8, 2015, CSJ, JUM and ZWE executed a three-party Agreement ("S/J/Z Agreement") relating to the Project entitled "Non-Exclusive License Agreement for Construction and Operation of the Gasification Demonstration Unit at the San Jose-Santa Clara Regional Wastewater Facility Property," which was jointly drafted by the parties.  The Regional Wastewater Facility ("RWF") is jointly owned by CSJ and the City of Santa Clara and operated by CSJ.  Among other things, the S/J/Z Agreement granted JUM and ZWE a non-exclusive license to enter the RWF property to construct and operate the gasification unit in compliance with the terms of the S/J/Z Agreement, the CEC Grant and Grant A1.  The term of the S/J/Z Agreement was October 31, 2014 to June 30, 2015.  Attached hereto as Exhibit "D" and incorporated herein by this reference is a true and correct copy of the S/J/Z Agreement.

11. Among other things, JUM was obligated by the S/J/Z Agreement to comply with and perform in conformity with the following requirements of the Grant:

a. Spend match funds concurrently or in advance of CEC funds for each task required by the Grant, including but not limited to acquisition of the gasifier pursuant to Grant Task 1.6;

b. Obtain permits required to complete work required by the Grant pursuant to Grant Task 1.7;

c. Provide a list of subcontracts, a description of the procurement process used, a schedule and copies of the subcontracts pursuant to Grant Task 1.8; and

d. Timely provide completed and approved Planning, Engineering and Design plans together with certain enumerated information including but not limited to, Concept of automation: Safety concept plan; Preliminary cost estimate calculations; Electrical schematic/wiring diagrams; and Monthly progress reports, pursuant to Grant Task 3.1.

12. JUM failed and refused to comply with its contractual obligations under Grant Tasks 1.6, 1.7 1.8 and 3.1.  CSJ has performed all of its obligations under the Grant except those excused by JUM's breaches.

13. Among other things JUM was also directly obligated under the S/J/Z Agreement to comply with and perform in conformity with the following requirements:

a. Comply with all laws including local laws and directives pursuant to Section 8.1;

b. Timely construct the gasification unit according to approved plans and specifications and the applicable schedule of performance pursuant to Sections 8.3 and 8.3.2;

c. Meet General Construction Standards, including but not limited to paying prevailing wages and selecting contractors using the public bidding process pursuant to Section 8.3.1;

d. Obtain, at its own expense, all government permits and approvals required to build the Project pursuant to Section 8.3.3;

  e. Comply with and incorporate into subcontractor agreements California state prevailing wage requirements pursuant to Section 8.3.5;

  f. Obtain payment and performance bonds pursuant to Section 8.3.6;

  g. Engage in preconstruction meetings for various purposes pursuant to Section 8.3.9;

  h. Provide the City with ten (10) days prior written notice of the commencement of any work done at the RWF pursuant to Section 8.3.10;

  i. Obtain approval in writing of all proposed work prior to commencing work pursuant to Section 8.4;

  j. Prepare an Operations and Maintenance Manual pursuant to Section 8.4.2;

  k. Prepare a written Environmental Management Plan pursuant to Section 8.4.3;

  l. Prepare a written Health & Safety Plan pursuant to Section 8.4.4;

  m. Provide the City with a monthly statement of the work performed the prior month pursuant to Section 10;

  n. Apply for CEC matching funds after expending its own matching funds pursuant to Section 10;

  o. Provide certificates of insurance funds pursuant to Section 15; and

  p. Perform all obligations in the time agreed since time was of the essence pursuant to Section 17.14.

  14. JUM failed and refused to comply with its contractual obligations under the S/J/Z Agreement, Sections 8.1, 8.3, 8.3.1, 8.3.2, 8.3.3, 8.3.5, 8.3.6, 8.3.9, 8.3.10, 8.4, 8.4.2, 8.4.3, 8.4.4, 10, 15, and 17.14. CSJ has performed all of its obligations under the S/J/Z Agreement, except those excused by JUM's breaches.

  15. Under the Grant, "Match Funds" is defined as "…cash or in-kind (non-cash) contributions provided by Recipient, subcontractors or other parties that will be used in the performance of this Agreement." Section 17 of the Grant states: "…The Recipient can only bill for actual expenses incurred…not to exceed the rates specified in the budget." Section 17 also calls for payments to be made on a reimbursement basis for expenditures after payment has been made for an approved budget item. Section 10 of the S/J/Z Agreement

states: "The CEC funds are disbursed through a reimbursement process after the required matching funds from the City [CSJ] and Licensee [JUM] are expended."

16. On or about January 20, 2015, JUM acting by through Dave McCarthy, its Chief Operating Officer and Van Rainey, its Director of Operations, submitted its invoice to CSJ for reimbursement by the CEC of JUM's expenditure of matching funds for the purchase of the Project gasifier unit. JUM's invoice falsely represented that JUM had paid its own matching funds totaling one million two hundred two thousand thirty-one dollars ($1,202,031). Attached hereto as Exhibit "E" and incorporated herein by this reference is a true and correct copy of said invoice.

17. CSJ reasonably relied on the false representation in JUM's invoice that its matching funds had been expended because JUM provided CSJ with a copy of the invoice from ICM to JUM and because JUM knew it could only be reimbursed for funds actually expended. CSJ submitted the invoice to the CEC for reimbursement to JUM. Shortly thereafter, JUM was paid one million eighty-one thousand eight hundred twenty-eight dollars ($1,081,828).

18. The true facts are that JUM never paid the required matching funds for the purchase of the Project gasifier unit. To date, JUM has only paid six hundred seventeen thousand dollars ($617,000.00) toward the more than two million four hundred four thousand sixty-two dollar ($2,404,062.00) purchase price of the Project gasifier unit. ICM retains possession of the Project gasifier unit because the full purchase price was never paid by JUM.

19. JUM concealed its fraudulent activity from CEC and CSJ by entering into an installment contract, the ICM Agreement, for the purchase of the Project gasification unit which was subject to a confidentiality provision. Although required to do so by the terms of both the Grant and the S/J/Z Agreement and despite numerous requests for that information, JUM has never provided to CSJ a copy of the ICM Agreement. On information and belief, it was JUM who insisted that a confidentiality provision be included in the ICM Agreement in order to conceal its scheme to defraud CSJ and CEC.

20. In or about late March, 2015 JUM informed CEC and CSJ that it would be unable to complete the Project on time even with a two week extension. CSJ requested and the CEC began the approval process for a third amendment to the Grant in order to provide JUM with sufficient additional time to complete the Project. The amendment was to be a "no-cost" amendment meaning that all funds reimbursable by the CEC would still need to be expended by the original Grant end date.

21. On or about April 10, 2015 ICM informed JUM by letter, with a copy to CSJ, that it was in breach of its agreement to make payment of the agreed purchase price for the equipment ordered pursuant to an Equipment Sale and Services Agreement dated December 17, 2014 relating to the gasifier project for CSJ. Among other things, ICM demanded immediate payment of sixty thousand dollars ($60,000) from JUM. ICM also demanded a detailed "sources and uses of funds" report providing evidence that JUM had the financial resources to complete the project. The letter noted that JUM had previously represented it would provide such a report but that the report had not yet been received. Attached hereto as Exhibit "F" and incorporated herein by this reference is a true and correct copy of ICM's April 10, 2015 letter to JUM.

22. Decker Engineering and Construction ("Decker") was supposed to do the site preparation work under a contract with JUM. Decker did not sign contracts with its subcontractors, and gave them only tentative start dates subject to getting a signed contract from JUM authorizing the site work. On or about April 21, 2015 Decker finally received a signed contract from JUM to begin the site preparation work.

23. Also on or about April 21, 2015 it was discovered that the staging site that had been planned for the contractors working on site preparation had been partially co-located with another contractor, Anderson Pacific ("AP") working on a different project. There was no problem with the site where the Project was to be built, which remained fully available. During this time, the CEC continued to work on issuing a third amendment to the Grant to extend the time for JUM to complete its work. On or about April 22, 2015 CSJ representatives met with representatives of AP who cooperated in resolving the staging

7

site issue.

24. On or about April 24, 2015 JUM contacted CSJ to complain about changes to the staging area and warned that JUM was "not prepared to incur any further delays or costs." JUM had never issued an invoice to CSJ for reimbursement for any work it had done on the project. The only invoice ever submitted by JUM was for the "purchase" of the Project gasifier unit from ICM. In the meantime Decker, continued preparations to work at the site while CSJ worked with Decker and JUM to attempt to resolve the issues.

25. Also on or about April 24, 2015 discussions ensued between CEC, CSJ and JUM attempting to resolve the issues. It appeared that a resolution was agreed by the parties subject to JUM giving its final approval the next day. At this time, CSJ reminded JUM that it was still seeking the required information on payment of prevailing wages and the date of the first advertisement, contact, or solicitation for a contractor.

26. JUM failed to contact the parties with a decision on April 25, 2015, as promised. Instead, on or about April 27, 2015 JUM advised CSJ that it could not begin construction for the Project "as we don't even have the rights to a suitable [staging] site." Meanwhile, CSJ continued to attempt to work with JUM to find a solution to the issues, still not knowing that JUM had never paid for the gasifier unit that was the heart of the Project.

27. On or about April 29, 2015, JUM sent a letter to the CEC with a copy to CSJ stating that it was terminating the S/J/Z Agreement "…for cause as the City lacked the authority to grant the license contained in the Agreement." At the time JUM terminated the S/J/Z Agreement, CSJ had expended countless resources advancing the Project, spent hundreds of thousands of dollars in matching funds, lost the value of the CEC funds paid to JUM and lost title to the gasifier unit.

### FIRST CLAIM FOR RELIEF

### [Breach of Contract]

28. Plaintiff incorporates by reference the foregoing paragraphs of this complaint.

29. CSJ has performed all of its obligations under the S/J/Z Agreement, except those excused by JUM's breaches.

30. JUM has breached its contract with CSJ by failing to meet its contractual obligations under Sections 8.1, 8.3, 8.3.1, 8.3.2, 8.3.3, 8.3.5, 8.3.6, 8.3.9, 8.3.10, 8.4, 8.4.2, 8.4.3, 8.4.4, 10, 15, and 17.14 of the S/J/Z Agreement and Grant Tasks 1.6, 1.7, 1.8 and 3.1.

31. CSJ is entitled to any and all compensatory damages flowing from JUM's breaches including but not limited to all sums spent by CSJ in furtherance of the failed project as well as the value of the gasifier unit, title to which was to reside in CSJ.

## SECOND CLAIM FOR RELIEF

### [Fraud]

32. Plaintiff incorporates by reference the foregoing paragraphs of this complaint.

33. JUM presented its invoice to CSJ in the total amount of two million four hundred four thousand sixty-two dollar ($2,404,062.00) which misrepresented that JUM was entitled to one million two hundred two thousand thirty-one dollars ($1,202,031) as reimbursement for the purchase of the gasifier unit.

34. JUM concealed the fact that it had not paid the entire two million four hundred four thousand sixty-two dollar ($2,404,062.00) purchase price for the gasifier unit by wrongfully entering into a confidentiality agreement with ICM which concealed the terms of the purchase agreement from CSJ and CEC and by failing and refusing to provide a copy of the purchase agreement to CSJ despite being contractually obligated to do so.

35. JUM knew that the representation contained in its invoice was false because as a co-author of the S/J/Z Agreement negotiated by the parties, it knew that the terms called for JUM to be reimbursed only for full and complete expenditures that had been made in furtherance of the Agreement, not partial and incomplete expenditures.

36. JUM intended to defraud CSJ because despite being contractually obligated to furnish CSJ a copy of the sales agreement with ICM, JUM failed and refused to do so, intentionally concealing the true facts of the sales arrangement from CSJ and CEC. JUM's intention to defraud CSJ is also manifest because JUM knew that under the terms of the S/J/Z Agreement which it had jointly drafted with the other parties, it was not entitled to

9

COMPLAINT                                                                Case No:

1295194

reimbursement because it had only paid to ICM a fraction of the purchase price of the gasifier unit.

37. CSJ justifiably relied on the misrepresentation in JUM's invoice that it was entitled to reimbursement because JUM provided an invoice from ICM as support for its own invoice. CSJ also justifiably relied on the misrepresentation because JUM had participated in the drafting of the S/J/Z Agreement which made it clear to the parties to that Agreement that "reimbursement" under the contract was for funds actually expended, so JUM indisputably understood the terms of reimbursement under the S/J/Z Agreement.

38. CSJ was damaged by JUM's fraud because under the terms of the Grant, which were incorporated by reference into the S/J/Z Agreement, title to the gasifier was to vest in CSJ since it was acquired with funds provided through the Grant and because the entire Project failed.

**WHEREFORE,** Plaintiff prays for judgment against Defendant, compensatory damages and punitive damages according to proof, costs, attorneys' fees and such other and further relief as the Court deems just and proper in the premises. Plaintiff demands a trial by jury as to all issues so triable.

Respectfully submitted,

Dated: March 24, 2016    RICHARD DOYLE, City Attorney

By:   /s/ Alan R. Lipton
      ALAN R. LIPTON
      Sr. Deputy City Attorney

Attorney for the CITY OF SAN JOSE